### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **TRANSGLOBAL INVESTMENTS,** | **:** | |
| **INC.**, *et al.*, | | |
| | **:** | **Civil Action 2:11-cv-178** |
| **Plaintiffs,** | | |
| | **:** | **Judge George C. Smith** |
| v. | | |
| | **:** | **Magistrate Judge Mark R. Abel** |
| **CDR TRANSFER, INC.**, *et al.*, | | |
| | **:** | |
| **Defendants.** | | |

### REPORT AND RECOMMENDATION

### I.

On February 28, 2011, Plaintiffs Transglobal Investments, Inc. ("TGI") and Paul L.

Parshall ("Parshall") filed this action against Defendants CDR Transfer Inc. ("CDR"), Bruce

Josephy ("Josephy"), and G. David Gordon ("Gordon").  Plaintiffs brought three claims.

First, they alleged that in June 1996, TGI (then operating under the name "Transglobal

Securities, Inc.") entered into a contract to sell CDR certain of its assets, including its stock

transfer business.  The contract provided that CDR would pay TGI seventy percent of the

receivables of the stock transfer business.  Although TGI performed its obligations under the

contract, CDR failed to pay TGI the approximately $29,000 in receivables it was owed.

Second, Plaintiffs alleged that the TGI-CDR contract provided that CDR would control

certain publicly-traded shell corporations, which it was to use to facilitate corporate

acquisitions, and that Parshall would receive a portion of any cash or equity obtained through

such transactions.  CDR, however, never made any payments or provided any accounting to Parshall.

Third, Plaintiffs alleged that one of TGI's clients before its asset sale to CDR was a company called Rose International, Ltd. ("Rose").  Plaintiffs maintain that before the asset sale, Parshall had been issued 432,415 shares of common stock in Rose.  According to Plaintiffs, CDR, CDR's president, Josephy, and Rose's president, Gordon, cancelled Parshall's shares in June 1997, without Parshall's knowledge or consent.  Parshall did not become aware of this cancellation until, at the earliest, August 2009.  Plaintiffs alleged in their Complaint that, on the date of cancellation, Parshall's shares in Rose were worth a minimum of $529,268.75.

The Court subsequently dismissed Defendant Gordon for failure to obtain service of process, but found the remaining two Defendants in default.  On November 30, 2011, the Court ordered the Clerk to enter the defaults against CDR and Josephy.[1]   Because the amount Plaintiffs sought was not a sum certain, the Court ordered a hearing to take place pursuant to Fed. R. Civ. P. 55(b)(2)(B) to determine the amount of damages Plaintiffs were entitled to pursue.  On January 20, 2012, Magistrate Judge Elizabeth Preston Deavers conducted a hearing, at which Plaintiffs entered certain documents into evidence and Parshall testified.  This matter is now before the Magistrate Judge for a recommended disposition and proposed findings of fact, pursuant to Fed. R. Civ. P. 72(b)(1) and 28 U.S.C. § 636(b)(1)(B).

---

[1]  The docket reflects that the Clerk did not enter the defaults pursuant to this Court Order.  Accordingly, the Court has redirected the Clerk to enter the defaults.  The defaults against CDR and Josephy have now been entered upon the record.

## II.

The following facts were adduced at the hearing.  Plaintiff Paul L. Parshall appeared and testified at the hearing on behalf of himself and Plaintiff TGI.  Defendants did not appear or otherwise submit evidence.  Plaintiffs introduced, and identified, a letter of intent setting forth the asset sale agreement between CDR and TGI.  Hearing Exh. 2.[2]  The letter of intent was accompanied by an appendix containing a list of shell corporations then-controlled by Parshall and the corresponding receivables associated with each.  The parties agreed to the payment of seventy percent of the receivables to TGI following the closing of each acquisition.  Plaintiffs introduced into evidence, and identified, a list of outstanding receivables that were due on the date of closing.  Hearing Exh. 3.  The receivables totalled $37,420.02.  Plaintiff Parshall testified further that neither he nor TGI received seventy percent of this sum, which would have totaled $26,194.01 if all the receivables had been collectable and actually collected.

The letter of intent between CDR and TGI was accompanied by another agreement between CDR and nonparty Worthington Company "and/or Paul Parshall."  This contract, which Plaintiff Parshall identified, implied, although it did not affirmatively state, that Worthington Company owned or exerted control over an attached list of "shell" public corporations.[3]  This agreement provided that CDR would utilize these shells in arranging

---

[2] The copy of the letter introduced into evidence was signed only by Bruce R. Josephy on behalf of CDR.  However, the record contains no evidence to dispute that the parties entered into the contract.

[3] Mr. Parshall confirmed at the hearing that he, through the Worthington Company, owned and controlled the shell corporations at the time the parties executed the agreement.

certain acquisitions.  Under the terms of the agreement, the proceeds were to be split between CDR and Worthington.[4]  The transfer of the shell corporations was to take place upon CDR's acquisition of the assets of TGI.

Parshall testified that Worthington Company was an SEC-registered investment company, which frequently facilitated transactions for the use of shell corporations and charged a fee for the negotiations.  He testified that he never received any information from CDR or Josephy concerning the status of the shell corporations, or whether or when any were utilized in restructuring transactions.  Parshall testified that CDR never made any payments relating to shell corporations.  Parshall further testified that he might have received fees of between $100,000 to $250,000 for each such transaction, but that he had no knowledge as to whether any of the shells were ever actually used or the amount of damages he had actually suffered.

Finally, Parshall testified that one of the stock transfer clients of TGI was nonparty Rose International, Inc. ("Rose").  He represented that, on June 20, 1996, he had been issued 423,415 shares of common stock in Rose as part of his compensation for a reverse merger agreement.  Plaintiffs produced a copy of the share certificate.  Hearing Exh. 4.  On April 15, 1997, Parshall attempted to deposit this security with a broker and was advised that the shares had been cancelled.  In 2008 or 2009, while reviewing documents from the TGI-CDR transaction, Parshall discovered an April 7, 1997 letter from Gordon to Josephy, which stated

---

[4]  Parshall testified at the hearing that shell corporations are useful because, though effectively defunct, these business entities have already gone through the process of becoming publicly traded companies.  Through the use of reverse mergers and other restructuring transactions, a financier can use a shell as a vehicle for a different, unrelated business to easily become a publicly traded corporation.

in part:

> As President of Rose International, Ltd., this letter is your authorization to cease any further transfers of the Company's stock until further notice from me without receiving approval from the Company or our corporate counsel.  This includes, but is not limited to, the shares of Daniel R. Moffatt and Paul Parshall.  It appears from our review that many of the shares were issued without receipt of any consideration.

Hearing Exh. 5.[5]  Parshall testified that he had attempted to make inquiries as to why his

shares had been cancelled, but that neither Rose nor its alleged successor corporation, Paid

Inc., had responded.  He produced at the hearing a document which he identified as a record

of the share price of Paid, Inc. on the Over-the-Counter Bulletin Board, which is an internet

site that tracks and quotes the moving-average price of stocks over time.  Based on this internet

quote, Parshall asserted that on May 15, 1997, the date of the cancellation, each share of Rose,

which had become Paid, Inc. was worth $14.00.  Hearing Exh. 7.  Parshall thus estimated his

damages for the loss of 423,415 shares at $5,927,810.00.  In addition, he produced a copy of

Rose International's June 8, 1998 Securities and Exchange Commission Form 10-KSB report.[6]

Hearing Exh. 8.  This SEC document indicates that the high and low bid prices for Rose's

---

[5]  Parshall also testified that in the course of his investigation he came across a March 9, 1999 letter from CDR to Old Monmouth Stock Transfer Co., Inc., which he surmised had taken over the relevant account from CDR.  Although the letter states that it is the "stock issue history and shareholders of record listings for Securities Resolution Advisors, Inc.," it contains a record that a transfer of 423,415 shares in this company to Parshall had been cancelled on May 15, 1997.  Hearing Exh. 6.  Parshall did not testify concerning Securities Resolution Advisors, Inc., and whether it was another successor to Rose.

[6]  The stock traded under the symbol DYES.

common stock for the quarter ending June 30, 1997 were 1 1/4 and 3/8, respectively.[7]

Hearing Exh. 8, at p. 4.  Based on this SEC document, the value of 423,415 shares of stock at an average value of .8125 would be $344,024.69.

## III.

### A.    Standard for Default Judgment

Federal Rule of Civil Procedure 55(b) provides in full:

(b)    **Entering a Default Judgment.**

    (1)    **By the Clerk**.  If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk--on the plaintiff's request, with an affidavit showing the amount due--must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.

    (2)    **By the Court.**  In all other cases, the party must apply to the court for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals– preserving any federal statutory right to a jury trial– when, to enter or effectuate judgment, it needs to:

        (A)    conduct an accounting;

        (B)    determine the amount of damages;

---

[7] The Court takes judicial notice that the average quotes for the shares during the relevant quarter in which they were cancelled was .8125.  *See* Fed. R. Evid. 201(a)(2) ("The Court may judicially notice a fact that is not subject to reasonable dispute because it: . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.")

(C)     establish the truth of any allegation by
        evidence; or

(D)     investigate any other matter.

Fed. R. Civ. P. 55(b).  In this case, the defaults have been entered against CDR and Josephy.

Plaintiffs moved for default judgment.  As the Court noted, Plaintiffs, in their Complaint, did

not seek a sum certain or one that could be made certain by computation.  Accordingly, the

Court ordered that a hearing be conducted to determine the amount of damages to which

Plaintiffs are entitled to collect pursuant Rule 55(b)(2)(B).  (ECF No. 11.)

        "'Where damages are unliquidated a default admits only the defaulting party's liability

and the amount of damages must be proved.'" *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110

(6th Cir. 1995) (quoting *Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1026 (5th Cir. 1982) (en

banc)).  The United States Court of Appeals for the Sixth Circuit has approved the approach

taken by the Second Circuit:  "'Even when a default judgment is warranted based on a party's

failure to defend, the allegations in the complaint with respect to the amount of the damages

are not deemed true.  The district court must instead conduct an inquiry in order to ascertain

the amount of damages with reasonable certainty.'" *Vesligaj v. Peterson*, No. 08-5942, 2009

WL 1286446, *3, 331 F. A'ppx 351 (6th Cir. May 11, 2009) (quoting *Credit Lyonnais Sec.*

*(USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (citations omitted)).  The Court

accepts all well-pleaded factual allegations in the Complaint relating to liability as true.  *United*

*States v. Wallace*, No. 1:09-cv-89, 2010 WL 2302377, at *2 (S.D. Ohio April 28, 2010)

("Once the default has been entered, the well-pleaded facts of the complaint relating to liability

must be accepted as true.").

**B.**     **Plaintiffs' Claims**

As to Plaintiffs' first claim, the undersigned concludes that Plaintiffs demonstrated that

CDR failed to pay TGI seventy percent of certain receivables which it was due under the CDR-

TGI asset purchase agreement.  The undersigned further finds that Plaintiffs have demonstrated

damages in the amount of $26,194.01 on this defaulted claim.

As to Plaintiffs' second claim, the well-pleaded allegations of the Complaint, together

with Parshall's testimony clarifying the claim, demonstrate that an agreement existed whereby

CDR would utilize certain shell corporations owned by Parshall or Parshall's company for

business transactions, and that CDR did not pay Plaintiffs any compensation resulting from this

agreement.  Plaintiffs, however, were unable to produce any evidence to demonstrate that

CDR ever used any of the shells or obtained benefit by doing so, or to otherwise establish the

existence or amount of any damages Plaintiffs suffered thereby.  Parshall and his counsel both

noted at the hearing that any such damages were unknown and entirely speculative.  Moreover,

the Court permitted Plaintiffs additional time following the hearing to adduce evidence related

to damages on this claim.  Plaintiffs, however, did not provide any such supplementation.  The

Court cannot say, therefore, with any degree of certainty that Plaintiffs suffered damages as a

result of Defendants' actions.  Accordingly, the undersigned finds that Plaintiffs have not

adduced evidence of damages sufficient for the Court to enter an award on this claim.

As to the third claim, Plaintiffs indicate that, prior to the asset purchase agreement at

issue in this case, Parshall was issued shares of stock in Rose as compensation for his work on

a reverse merger.  Plaintiffs state in their Complaint that CDR acquired Rose from TGI as part

the asset purchase agreement.  Plaintiffs allege that Parshall "had been validly issued" 432,415

shares of common stock in Rose, but that Defendants CDR, Josephy, and Gordon cancelled these shares without Parshall's knowledge or consent, causing him damages.  (Compl ¶ 19, ECF No. 2.)  Plaintiffs indicate that Defendants "purposely withheld" knowledge of this cancellation for several years.  (*Id.* at ¶ 4.)

Plaintiff's third claim sounds in conversion for the wrongful transfer by a corporation of certificates of stock with knowledge of a third-person's rights therein.  *See West v. American Tel. & Tel. Co.*, 54 Ohio App. 369 (Ohio App. 8 Dist. 1936) (holding wrongful transfer by corporation of certificates of its stock will render corporation liable for conversion).  "Conversion" "is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. Gen. Motors Corp.* 49 Ohio St.3d 93, 96 (Ohio 1990). The measure of damages in a conversion action is the value of the converted property at the time it was converted.  *State Farm Mut. Auto. Ins. Co. v. Advanced Impounding & Recovery Servs.*, 165 Ohio App. 3d 718, 723 (Ohio App. 10 Dist. 2006) (citing *Tabar v. Charlie's Towing Serv., Inc.*, 97 Ohio App.3d 423, 427–28 (Ohio App. 8 Dist. 1994)).

Plaintiffs have demonstrated that Defendants wrongfully disposed of Plaintiffs' property by cancelling the stock certificates without authorization and against corporate law.  As to evidence of damages, the Court concludes that, as between the internet Over-the-Counter Bulletin Board quotation and the SEC Form 10-KSB, the latter represents a more accurate and reliable indicator of Plaintiffs' losses.  According to this SEC document, the value of 423,415 shares of stock trading at an average of .8125 in May of 1997, the time of the conversion, was $344,024.69.  The undersigned concludes that Plaintiffs have demonstrated damages in the

amount of $344,024.69 on the third claim for relief.

As for Plaintiffs' demand for punitive damages, such exemplary damages may be awarded in a conversion action only when the claim involves elements of malice or fraud. *Pruitt v. LGR Trucking, Inc.*, 148 Ohio App. 3d 481, 487 (Ohio App. 1st Dist. 2002). Here, the undersigned concludes that Plaintiffs have produced no evidence from which the Court can determine that Defendants acted with malice in their decision to cancel the stock certificate. Indeed, the evidence indicates that Mr. Gordon of Rose doubted whether the shares were issued for valuable consideration. Hearing Exh. 5 (April 7, 2007 letter to Joesephy at CDR from Gordon, President of Rose International, Ltd.) ("It appears from our review that many of the shares were issued without receipt of any consideration.")) To be sure, the Court does not question Parshall's testimony to the effect that he received the shares in consideration for his work on the reverse merger. Mr. Gordon's statement to CDR and Josephy in the letter, however, is the only evidence of record reflecting Defendants' state of mind with respect to the directive to cancel the stock. This evidence suggests that Defendants did not act with the requisite malevolent intent necessary to support a finding of malice or the imposition of punitive damages.

## C.    Attorney's Fees

Plaintiffs' counsel has submitted an affidavit indicating that he expended thirty-one (31) hours in connection with his representation of Plaintiffs in this matter. (ECF No. 18, Ryerson Aff. ¶ 8.) According to his affidavit, counsel's normal billing rate is $100 an hour. Accordingly, the undersigned determines that Plaintiffs have demonstrated their entitlement to $3,100.00 in attorney's fees.

**IV.**

For the foregoing reasons, the undersigned **RECOMMENDS** that judgment be entered against Defendants in the amount of $26,194.01 on Plaintiffs' first claim; that no damages be awarded against Defendants on Plaintiffs' second claim; that judgment be entered against Defendants as to Plaintiffs' third claim in the amount of $344,024.69, for a total of **$370,218.70.**  Further, Plaintiffs are entitled to an award of attorney's fees in the amount of **$3,100.00.**

**V.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto.  28 U.S.C. § 636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005); *Miller v. Currie,* 50 F.3d 373, 380 (6th Cir. 1995).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991).

DATED:  <u>August 31, 2012</u>          <u>/s/ *Elizabeth A. Preston Deavers*</u>
                                    **ELIZABETH A. PRESTON DEAVERS**
                                    **UNITED STATES MAGISTRATE JUDGE**

11